**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK,

Plaintiff,

– against –

UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240;

DOUG BURGUM, in his official capacity as United States Secretary of the Interior, 1849 C Street, N.W., Washington, D.C. 20240;

BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240; and

WILLIAM KIRKLAND, in his official capacity as Assistant Secretary – Indian Affairs, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240,

Defendants.

Civil Action No. ________

**COMPLAINT**

Plaintiff the State of New York (the "State"), for its Complaint against Defendants the United States Department of the Interior ("DOI" or "Interior"); Doug Burgum, in his official capacity as United States Secretary of the Interior (the "Secretary"); the Bureau of Indian Affairs ("BIA"); and William Kirkland, in his official capacity as Assistant Secretary – Indian Affairs (the "Assistant Secretary") (collectively, "Defendants"), alleges as follows:

**PRELIMINARY STATEMENT**

1. The State brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to vacate a February 14, 2023 determination by DOI (the "Decision")

(annexed hereto as **Exhibit A**) that two parcels of land at 5 Miami Street and 124 Chicago Street in the City of Buffalo, New York (the "Site" or, as referred to in the Decision, the "Miami Street Parcels"), are held by the Seneca Nation of Indians (the "Nation") in restricted fee status under Section 8(c) of the Seneca Nation Settlement Act of 1990, Pub. L. No. 101–503, 104 Stat. 1292 (formerly codified at 25 U.S.C. §§ 1774 et seq.) (the "Settlement Act").

2. The effect of the Decision is to subject the approximately 3.85-acre Site beside the Buffalo River in the City of Buffalo to the restraint on alienation of 25 U.S.C. § 177 and, pursuant to the Settlement Act and case law applying it, to constrain or divest the State of its sovereign authority to apply and enforce its laws on that land.

3. The Decision is unlawful and arbitrary and capricious for at least two reasons. First, the Settlement Act authorizes restricted fee status only for land acquired "with funds appropriated pursuant to this Act," Settlement Act § 8(c), 104 Stat. at 1297, and DOI accepted an account label in place of any determination that Settlement Act funds actually remained and were used to acquire the Site. Second, the Decision sanctions a use of Settlement Act funds that the Nation expressly bargained away in Section 11 of the federally approved Nation-State Gaming Compact between the Nation and the State (the "Compact"). Compact §§ 11(b)(4), 11(c). A copy of the Compact along with the then-Secretary of the Interior's letter deeming the Compact approved, dated November 12, 2002 ("Compact Approval Letter"), is annexed hereto as **Exhibit B**.

4. In the Compact, the Nation expressly agreed to use "all but five million dollars ($5,000,000.00)" of its remaining Settlement Act funds to acquire its Niagara Falls and Buffalo gaming sites, and to "dedicate" any funds remaining after those acquisitions "to the acquisition of parcels to meet the housing needs of the Nation's members," which, "[u]nless otherwise agreed by

the Parties, . . . shall be physically and immediately contiguous and adjacent to” an existing reservation or one of the gaming sites. Compact §§ 11(b)(4), 11(c).

5. The Secretary reviewed the Compact in 2002 and “allow[ed] this Compact to take effect without Secretarial action.” Compact Approval Letter at 1. In other words, the Secretary stated that “the Compact [was] considered to have been approved, ‘but only to the extent [it] is consistent with the provisions of [the Indian Gaming Regulatory Act (“IGRA”)].’” *Id*. at 7–8.

6. The Secretary reviewed the Compact with knowledge that the Compact “reserv[ed] five million dollars for housing adjacent to the gaming sites.” *Id*. at 1.

7. The Site is not a housing parcel. Nor is it “physically and immediately contiguous and adjacent to . . . an existing reservation of the Nation” or the Buffalo gaming site, as required by Section 11(c) of the Compact.

8. Moreover, the State, the only other “Party” to the Compact and the only entity whose agreement could waive or remove the restrictions regarding the use of Settlement Act funds to which the Nation agreed in Section 11(c) of the Compact, has never agreed to the Site’s acquisition with Settlement Act funds. Compact §§ 1(x)–(y), 11(c). DOI nonetheless approved restricted fee status in the Decision without any reference to or consideration of the terms of the Compact.

9. Based on the foregoing, and as more fully explained below, the State seeks a declaration that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and an order vacating it. 5 U.S.C. § 706(2)(A), (C).

## JURISDICTION

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–706, and the Settlement Act, Pub. L. No. 101–503, 104 Stat. 1292.

11. The United States has waived its sovereign immunity for this action, which seeks relief other than money damages against an agency and its officers for agency action. 5 U.S.C. § 702.

12. The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and may hold unlawful and set aside agency action under 5 U.S.C. § 706.

13. The Decision is final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704. The Decision is a signed memorandum, issued by the Principal Deputy Assistant Secretary – Indian Affairs exercising the authority of the Assistant Secretary, that, *inter alia*, directs the Eastern Regional Director to "record the deed to the Miami Street Parcels as 'restricted fee.'" Decision at 1–3. The Decision marks the consummation of DOI's decision-making on the Nation's submission, and legal consequences flow from it, including the displacement of State jurisdiction.

14. This action is timely filed within six years after the Decision was issued on February 14, 2023. 28 U.S.C. § 2401(a).

## VENUE

15. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are an agency and officers of the United States; a substantial part of the events or omissions giving rise to the claims occurred in this District; and the property that is the subject of the action is situated in this District, in the City of Buffalo, County of Erie, and State of New York.

## PARTIES

16. Plaintiff the State of New York is a sovereign State of the United States and brings this action in its sovereign capacity.

17. Defendant United States Department of the Interior is an executive department and agency of the United States within the meaning of 5 U.S.C. § 551(1). DOI, through the Secretary and the Assistant Secretary, administers Section 8(c) of the Settlement Act.

18. Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity. The Settlement Act assigns to the Secretary the determination whether land acquired under Section 8(c) "should not be subject to" 25 U.S.C. § 177. Settlement Act §§ 3(6), 8(c), 104 Stat. at 1294, 1297.

19. Defendant Bureau of Indian Affairs is a bureau within DOI. The Decision directs BIA's Eastern Regional Director to record the deed to the Site as restricted fee.

20. Defendant William Kirkland is the Assistant Secretary for Indian Affairs and is sued in his official capacity. The Decision was issued under the authority of the Assistant Secretary.

## STANDING

21. The State has standing to bring this action. The Decision inflicts concrete, particularized, and ongoing injuries to the State's sovereign interests that are fairly traceable to the Decision and would be redressed by the relief requested.

22. A State's sovereign interests include the exercise of sovereign power over the individuals and entities within its jurisdiction, which involves the power to create and enforce a legal code, both civil and criminal, and the maintenance and recognition of its borders and territory. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 601 (1982). Injury to

those sovereign interests is a cognizable injury in fact. States are also entitled to special solicitude in a standing analysis when they seek to vindicate sovereign prerogatives and a procedural right Congress has afforded them. *See Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007).

23. Before the Decision, the Site was fee simple land subject to the State's sovereign regulatory authority, including the environmental and taxing jurisdiction of the State and its political subdivisions, including the City of Buffalo, as it had been for more than a century.

24. The Decision directs that the Site be recorded as restricted fee land subject to the Nonintercourse Act.

25. DOI has taken the position that such land is "Indian country" within the meaning of 18 U.S.C. § 1151, over which the Nation has jurisdiction and which may become part of a reservation. Compact Approval Letter at 6.

26. The Second Circuit has concluded, with respect to parcels placed into restricted fee status under the Settlement Act, that the State is "divested of its jurisdiction." *Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 283–84 (2d Cir. 2015). Putting aside the degree of that divestment, or any exceptions to it, it is well settled that when a State is prevented by federal law from enforcing its own laws it experiences sovereign injury (and, indeed, irreparable injury). *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (cleaned up) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("States have a sovereign interest to sue the United States when a federal regulation purports to preempt state law.").

27. As a direct result, the Nation asserts that State law and local law governing land use, environmental protection, and remediation no longer apply to the Site. Any such displacement

of the State's sovereign authority over land within its borders is a concrete and particularized injury to the State.

28. In September 2026, the Nation disclosed its intent to develop the Site as a gas station/truck stop, a use involving the storage and dispensing of motor vehicle fuel beside the Buffalo River. The Nation also disclosed an intent that the Site will have a convenience store, cannabis dispensary, and fast-food restaurant on the premises.

29. On information and belief, the Nation has begun such development without State permits, State environmental review, or compliance with State or local law. The Decision impairs the State's ability to enforce its environmental and public health laws, including those governing development on the Site, petroleum bulk storage, and discharges on the Site.

30. Additionally, the Decision impairs the State's sovereign authority, through the City of Buffalo, to impose real property taxes on the restricted fee land.

## FACTUAL ALLEGATIONS

### A. The Settlement Act

31. Congress enacted the Settlement Act in 1990 to resolve land-related disputes arising from the 99-year leases of Seneca Nation lands in and around the City of Salamanca, New York, under which the Nation received below-market rents, and to provide for the continued occupancy of those lands by non-members.

32. The Settlement Act defines "Seneca Nation" as "the Seneca Nation of Indians of the Allegany, Cattaraugus, and Oil Spring Reservations." Settlement Act § 3(7), 104 Stat. at 1294. The Act does not confer benefits or rights on any other Seneca entity or with respect to any other reservation.

33. The Settlement Act provides for settlement funds from two sources. The United States was to pay the Nation $30 million as "the Federal share of the cash payment to be managed, invested, and used by the Nation," and $5 million for economic and community development. Settlement Act § 6(b)(1)–(2), 104 Stat. at 1295–96. The State was to provide $16 million in cash payments and $9 million for economic or community development. Settlement Act § 6(c), 104 Stat. at 1296. The total amount therefore allocated to the Nation for purposes of land acquisition in accordance with Section 8(c) of the Settlement Act was, at most, $46 million ($30 million Federal share and $16 million State share). The remainder of Settlement Act funds – $14 million – was specifically allocated for economic and community development purposes ($5 million Federal share and $9 million State share).

34. The Settlement Act limits the funds available: "The only amounts available to carry out this Act shall be those amounts specifically appropriated by the Congress or the legislature of the State to carry out this Act." Settlement Act § 6(e), 104 Stat. at 1296.

35. Section 8(c) of the Settlement Act conditions restricted fee status on three requirements: (a) that the land be acquired "with funds appropriated pursuant to this Act"; (b) that the land be "within [the Nation's] aboriginal area in the State" or "situated within or near proximity to former reservation land"; and (c) that notice be provided to State and local governments. Settlement Act § 8(c), 104 Stat. at 1297.

**B. The Compact and Its Limits on the Use of Remaining Settlement Act Funds**

36. The Nation and the State executed the Compact on August 18, 2002.

37. By letter dated November 12, 2002, the then-Secretary informed the Nation and the State: "I have decided to allow this Compact to take effect without Secretarial action." Compact

Approval Letter at 1. As a result, the Compact was "considered to have been approved, 'but only to the extent the compact is consistent with the provisions of [IGRA].'" *Id.* at 7–8.

38. The Compact authorized the Nation to establish gaming facilities at a site in the City of Niagara Falls, at a site in the City of Buffalo ("or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason"), and on current Nation reservation territory. Compact § 11(a)(1)–(3).

39. The Nation agreed to use "all but five million dollars ($5,000,000.00)" of its remaining Settlement Act funds to acquire the Niagara Falls and Buffalo gaming sites, and to dedicate any funds remaining after those acquisitions to housing parcels that, "[u]nless otherwise agreed by the Parties," are "physically and immediately contiguous and adjacent to" an existing reservation or a gaming site. *Id.* §§ 11(b)(4), 11(c).

40. The Compact may be "amended or modified by written agreement of the Nation and the State." *Id.* § 16(a). The State has never agreed, in writing or otherwise, to modify Section 11(b)(4) or 11(c), or to permit the use of Settlement Act funds to acquire the Site.

41. The Nation used Settlement Act funds to acquire the Niagara Falls and Buffalo gaming sites, consistent with Section 11(b)(4).

42. The Buffalo gaming facility is located on approximately nine acres at 1 Fulton Street. The Site is separate from, and is not contiguous with or adjacent to, that parcel.

### C. The Nation's Acquisition of the Site

43. The Site comprises approximately 3.85 acres at 5 Miami Street and 124 Chicago Street in the Old First Ward of Buffalo, and adjacent to River Fest Park, Conway Park, and commercial venues along the Buffalo River.

44. The Site is not on any reservation of the Nation.

45. On information and belief, the Site was used for industrial and commercial purposes by private owners for more than a century and was at all times subject to the jurisdiction and regulatory authority of the State and City of Buffalo. More recently, the Site has been undeveloped greenspace and became part of the City of Buffalo's Local Waterfront Revitalization Program, which seeks to protect and promote various State interests related to the waterfront. Nearby properties include a public park, an outdoor events venue, restaurants, and a rock gym.

46. In 2007, the Seneca Erie Gaming Corporation, an instrumentality of the Nation, purchased the Site from Ramcol Fibres, Inc. for $309,000, and the Site remained subject to State and City jurisdiction thereafter.

47. By quitclaim deed dated November 15, 2022, and recorded in the Erie County Clerk's Office on November 30, 2022, the Seneca Erie Gaming Corporation, described in the deed as a "government instrumentality of the Seneca Nation of Indians," conveyed the Site to the Nation for $326,000. **Exhibit C** at 2–3.

48. According to the Decision, the Nation instructed Brown Brothers & Harriman to transfer $326,000 "from the Seneca Settlement Act Account to the Seneca Niagara Falls Gaming Corporation Account to pay for the parcels." Decision at 2.

49. The recipient, Seneca Niagara Falls Gaming Corporation, was not the grantor of the Site. *Id*. at 2–3. Instead, the grantor was the Seneca Erie Gaming Corporation.

50. Regardless, both the transferor account and the transferee account were held or controlled by the Nation or its instrumentalities.

51. On information and belief, no funds passed outside the Nation's enterprises in exchange for the Site.

**D. The Exhaustion of Settlement Act Funds and the State's Longstanding, Unanswered Requests for an Accounting**

52. As referenced above, based on the provisions of the Compact, and as set forth below, the Nation's prior land acquisitions using Settlement Act funds exhausted the funds appropriated for land acquisition long before the acquisition of the Site by the Nation.

53. In 2002, pursuant to a negotiated agreement with the State, the Nation acquired the Niagara Falls Convention and Civic Center and surrounding property in the City of Niagara Falls for its Niagara Falls gaming facility, which opened as the Seneca Niagara Casino on December 31, 2002. As part of that transaction, the Nation was required to satisfy outstanding general obligation bonds incurred in connection with construction of the Convention Center, which had a value of $23.9 million at the time of payment and which the State agreed to accept in an early, discounted payment of approximately $22.0 million. In addition, the State assisted the Nation in acquiring an approximately 50-acre footprint in Niagara Falls through eminent domain, for which approximately $31.5 million was paid to condemnees, and the Nation reimbursed the State from Settlement Act funds. These facts were summarized by the State in a November 29, 2011 letter from the State to then-Assistant Secretary – Indian Affairs, Larry Echo Hawk, responding to the Nation's notification that it intended to place approximately 54.62 acres in the Town of Collins, Erie County, in restricted fee status under the Settlement Act. *See* **Exhibit D**, November 29, 2011 Letter from the State to then-Assistant Secretary Echo Hawk, at 3 (which was included as part of the State's January 22, 2026 objection letter to DOI concerning a parcel in Grand Island).

54. Thus, prior to the Decision, DOI was on notice of the State's "serious concerns whether any [Settlement] Act funds remain." *Id.* at 2. DOI evidently did not consider those facts or that issue at all in making the Decision.

55. Upon information and belief, the Nation expended approximately $53.5 million of Settlement Act funds in connection with the Niagara Falls acquisitions alone, exceeding the, at most, $46 million of funds appropriated for land acquisition under Section 8(c) of the Settlement Act.

56. On October 3, 2005, the Seneca Gaming Corporation purchased a nine-acre parcel in the City of Buffalo for $4.6 million and resold it to the Nation for $4 of Settlement Act funds. Upon information and belief, following that related-party transaction, former Associate Deputy Secretary of the Interior James E. Cason caused the Settlement Act funds to be audited to determine the balance remaining. Upon information and belief, that audit determined that the fair market value of acquired property, rather than a fractional or nominal related-party purchase price, must be used in accounting for Settlement Act expenditures, and found that the Settlement Act funds were fully depleted. *See id.* at 3.

57. Upon information and belief, according to the Seneca Gaming Corporation Form 10-K for the Fiscal Year ended September 30, 2009, as filed with the United States Securities and Exchange Commission, the Nation had made additional land purchases in the vicinity of its gaming facilities, including approximately two acres and a hotel property within the Niagara Falls footprint for $7.9 million in December 2005, and a two-block section of Fulton Street in Buffalo for $631,600 in November 2006. *See id.* at 3 n.7. There is no record that DOI ever considered whether any of those acquisitions depleted Settlement Act funds such that there may have been none left at the time of the Decision.

58. In its November 29, 2011 letter to then-Assistant Secretary Echo Hawk, the State explained that the Nation had provided no evidence that Settlement Act funds had been used; that, to the State’s knowledge, there had been no public accounting of Settlement Act monies; that the

State understood DOI had found the funds fully depleted; and that the tabulation of the Nation's historic land expenditures "well exceeds the full 1990 Act appropriation." *Id.* at 2, 4. The State urged the Secretary to delay any determination "until an accounting of the Act funds balance has been provided to both State and local governments and each has a reasonable opportunity to respond to same." *Id.* at 4.

59. The State's 2011 letter also explained that use of fair market value is the only logical accounting method for calculating Settlement Act expenditures, because permitting a fractional purchase price basis "could lead to an infinite drain on local real property tax rolls and obviate any utility in State and local government commentary, thwarting Congressional intent [as expressed in the Settlement Act]." *Id.*

60. Some 21 months later, the State received a reply from DOI's Office of Indian Gaming stating only that the Nation had withdrawn the Town of Collins parcel from DOI's consideration in February 2013. No accounting was provided to the State at that time.

61. By letter dated September 9, 2016 to then-Acting Assistant Secretary Lawrence S. Roberts regarding a renewed plan by the Nation to place parcels in the Town of Collins into restricted fee status, the State noted that it had still not received any accounting of the Settlement Act funds balance, and renewed the State's request that the Secretary delay any determination until the State had been provided an opportunity to review and comment on an accounting of the Settlement Act funds balance. *See* Exhibit D, September 9, 2016 Letter from the State to then-Acting Assistant Secretary Roberts.

62. As recently as January 2026, in objecting to the placement of a different parcel of land in restricted fee, the State informed DOI that no accounting of Settlement Act funds has ever

been provided. *See* Exhibit D, January 22, 2026 Letter from the State to Secretary Burgum regarding Grand Island parcel.

63. In sum, DOI has never provided the State with an accounting of Settlement Act funds, never disclosed the methodology by which it has calculated any remaining balance, and never responded substantively to the State's requests.

**E. The Nation's Notification to the State and the DOI Decision**

64. By letter dated December 21, 2022, the Nation informed the Governor that it was "moving forward" to submit land "commonly referred to as the 'Miami Street Parcels'" to DOI for restricted fee status. *See* **Exhibit E**. The letter did not identify the parcels by street address, tax map number, or acreage; did not identify the purchase price; and did not include the documentation the Nation submitted to DOI. *See id.*

65. On information and belief, DOI did not transmit the Decision to the State, publish it, or otherwise notify the State that it had been issued. The Decision is an internal DOI memorandum addressed to the Regional Director of the Eastern Region from the Principal Deputy Assistant Secretary – Indian Affairs and shows no copy transmitted to the State. *See* Decision at 1.

66. On February 14, 2023, the Principal Deputy Assistant Secretary—Indian Affairs, exercising the authority of the Assistant Secretary, issued the Decision. *Id.* The Decision relies on the Nation's December 21, 2022 submission and supporting tabs, which are not attached to the Decision. *Id.* at 1 & nn.1, 4.

67. With respect to the Settlement Act condition that Settlement Act funds be used for the acquisition, the Decision relies on the Nation's instruction to Brown Brothers & Harriman to transfer $326,000 from an account labeled the "Seneca Settlement Act Account" to an account of the Seneca Niagara Falls Gaming Corporation, and on Key Bank's confirmation of receipt. *Id.* at 2.

The Decision found that the price, based on 2022 tax assessments, reflected "current fair market value." *Id.* at 2 & n.10.

68. The Decision does not determine, let alone address, whether any funds appropriated pursuant to the Settlement Act remained in 2022–2023; does not address the Nation's prior expenditures of Settlement Act funds; does not explain why an intra-Nation transfer constitutes an acquisition with Settlement Act funds; and does not address the State's longstanding requests for an accounting of such funds.

69. On the geographic condition, the Decision relies on (a) the Treaty of Canandaigua as recognizing a Seneca aboriginal area that includes present-day Erie County and (b) DOI's 2002 letter allowing the Compact to take effect, in which DOI opined "that the City of Buffalo is situated within or near proximity to the Nation's former Buffalo Creek and Tonawanda reservations for purposes of the Settlement Act." *Id.* at 1–2 & nn.5–7.

70. The Decision does not mention Section 11(b)(4) or 11(c) of the Compact, does not determine whether the $326,000 came from the $5,000,000 the Compact reserved for housing, does not find that the Site is a housing parcel or that it is contiguous or adjacent to any reservation or gaming site, and does not find that the State agreed to the acquisition.

71. The Decision directs the Eastern Regional Director to "record the deed to the Miami Street Parcels as 'restricted fee.'" *Id.* at 3.

**F. Events Following the Decision**

72. On information and belief, from the Nation's 2022 acquisition until September 2026, the Nation exercised neither physical control nor sovereign authority over the Site, which continued to function as part of the City of Buffalo and to benefit from City infrastructure and services.

73. In September 2026, the Nation disclosed its intent to build a gas station/truck stop on the Site without State or local approval and commenced construction soon thereafter. On information and belief, the Nation did not ensure consistency with the Local Waterfront Revitalization Program when proposing this development.

## FIRST CLAIM FOR RELIEF

**(Violation of the APA, 5 U.S.C. § 706(2)(A) and (C): The Decision Is Arbitrary, Capricious, an Abuse of Discretion, Not in Accordance with Law, and in Excess of Statutory Authority Because the Site Was Not Acquired with Funds Appropriated Pursuant to the Settlement Act)**

74. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

75. Section 8(c) of the Settlement Act authorizes restricted fee status only for land "acquired by the Seneca Nation with funds appropriated pursuant to this Act." Settlement Act § 8(c), 104 Stat. at 1297.

76. The "only amounts available to carry out this Act" are "those amounts specifically appropriated by the Congress or the legislature of the State…." Settlement Act § 6(e), 104 Stat. at 1296.

77. Acquisition with appropriated Settlement Act funds is a statutory condition precedent to restricted fee status, and DOI has no authority to confer that status on land that does not satisfy it.

78. As discussed above, the appropriated Settlement Act funds for land acquisition were finite – at most, $46 million comprising a $30 million Federal cash payment and a $16 million State cash payment (assuming a Federal statute may require the appropriation of State funds). Settlement Act §§ 6(b)–(c), 6(e), 104 Stat. at 1295–96.

79. On information and belief, the Nation thereafter expended those funds on the gaming sites and other acquisitions, and no appropriated Settlement Act funds remained available in 2022 for the acquisition of the Site.

80. Further, and at a minimum, DOI could not lawfully find that the Site was acquired with "funds appropriated pursuant to this Act" without determining whether any appropriated funds remained and whether the funds used were appropriated funds. DOI made neither determination.

81. DOI also ignored the State's repeated statements for over a decade that no accounting of Settlement Act funds had ever been provided and that it had serious concerns whether any funds remained.

82. The Decision does not determine whether the balance in the account from which the $326,000 was drawn consisted of appropriated funds, investment income, reinvested proceeds, commingled monies, or funds from other sources.

83. The transaction submitted by the Nation on which DOI relied does not reflect an acquisition "with" Settlement Act funds.

84. The $326,000 purchase price for the Site in November 2022 was transferred between accounts within the Nation's own enterprise.

85. DOI, however, accepted the Nation's characterization of this intra-Nation transfer without explanation or investigation.

86. Because the Nation's purchase from its own instrumentality left the funds within the Nation's enterprise, the Decision's reasoning would permit the Nation to convert any land held by any of its instrumentalities into restricted fee land by moving money from an account bearing a Settlement Act label to another of its own accounts without limit. That result cannot be reconciled

with the finite appropriations Congress and the New York State Legislature made or with Section 6(e) of the Settlement Act.

87. DOI entirely failed to consider important aspects of the problem or matter before it, offered no rational explanation for its conclusion that the source-of-funds condition was satisfied, and reached a conclusion that runs counter to the evidence before it.

88. The Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and should be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (C).

## SECOND CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A) and (C): The Decision Fails to Consider and Violates the Federally Approved Gaming Compact)

89. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

### A. The Compact Governs the Use of Any Remaining Settlement Act Funds

90. The Compact is a binding agreement between the Nation and the State that took effect under federal law upon the Secretary's deemed approval. Compact § 4(a); Compact Approval Letter at 1, 7–8.

91. Sections 11(b)(4) and 11(c) of the Compact establish the exclusive framework for the Nation's use of Settlement Act funds after 2002. The Nation agreed to use "all but five million dollars" of its remaining Settlement Act funds to acquire the gaming sites, and to "dedicate" any Settlement Act funds remaining after those acquisitions "to the acquisition of parcels to meet the housing needs of the Nation's members." Compact §§ 11(b)(4), 11(c).

92. Section 11(c) imposes two conditions on any such acquisition: the parcel must be acquired "to meet the housing needs of the Nation's members," and, "[u]nless otherwise agreed

by the Parties," it must be "physically and immediately contiguous and adjacent to either: (i) an existing reservation of the Nation, or (ii) the sites referenced in Paragraph 11(a)(1) and 11(a)(2) if actually acquired [*i.e.*, the casinos in Niagara Falls and Buffalo]." Compact § 11(c).

**B. The Acquisition of the Site Violates Sections 11(b)(4) and 11(c) of the Compact**

93. The acquisition of the Site with purported Settlement Act funds violates Sections 11(b)(4) and 11(c) of the Compact.

94. The Site was not acquired "to meet the housing needs of the Nation's members."

95. Instead, the Nation is developing the Site as a gas station/truck stop.

96. The Nation's December 21, 2022 notification to the Governor invoked the Site's "near proximity" to the "existing [Buffalo gaming] facility," not any housing purpose. Exhibit E.

97. Even if the Site were for housing purposes (which it is not), it still does not meet the requirements of Section 11(c): it is not "physically and immediately contiguous and adjacent to" the Buffalo gaming site, as that gaming site is on a separate nine-acre parcel at 1 Fulton Street.

98. Nor is the Site "physically and immediately contiguous and adjacent to . . . an existing reservation of the Nation," as required by Section 11(c).

99. The State has not "otherwise agreed" to the acquisition of the Site with Settlement Act funds, to any non-housing use of such funds, or to any relaxation of the contiguity requirement. Compact §§ 11(c), 16(a).

**C. Under Either Account of the Funds, the Decision Cannot Stand**

100. If, as the State alleges in the First Claim for Relief, no appropriated Settlement Act funds remained in 2022, the Site was not acquired with such funds and is ineligible for restricted fee status. Settlement Act § 8(c), 104 Stat. at 1297.

101. If, alternatively, the $326,000 was drawn from appropriated Settlement Act funds remaining after the gaming site acquisitions, those funds were the funds the Nation had dedicated under Section 11(c) exclusively to qualifying housing parcels, and their use to acquire the Site violated the Compact. Compact §§ 11(b)(4), 11(c).

102. Either way, DOI could not lawfully conclude that the Site was acquired with Settlement Act funds available for that purpose. The Decision does not acknowledge, much less resolve, this dilemma.

**D. DOI Was Required to Consider the Compact, and Its Failure to Do So Was Arbitrary, Capricious, an Abuse of Discretion, Not in Accordance with Law, and in Excess of Statutory Authority**

103. DOI had actual knowledge of the Compact – and, indeed, allowed it to take effect – including Sections 11(b)(4) and 11(c). It reviewed those provisions in 2002 and relied on its Compact review in the Decision itself. Decision at 2 & n.7.

104. The Nation's own notification letter to the Governor regarding the Site also invoked the Compact. *See* Exhibit E.

105. Having relied on its 2002 review of the Compact to find the geographic condition was satisfied here, DOI could not rationally ignore the provisions of the same Compact that limit the use of the funds on which restricted fee status depends.

106. Restricted fee status under Section 8(c) of the Settlement Act depends on acquisition with Settlement Act funds, and whether such funds were available for a particular acquisition depends on the Nation's binding, federally approved commitments concerning those funds.

107. DOI's failure to consider whether the acquisition complied with Sections 11(b)(4) and 11(c) of the Compact was a failure to consider an important aspect of the problem or matter before it.

108. By conferring restricted fee status on an acquisition that the Compact expressly forbids, the Decision gives federal effect to a breach of a federally approved compact.

109. The Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and should be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (C).

## THIRD CLAIM FOR RELIEF

**(Declaratory Judgment, 28 U.S.C. §§ 2201–2202: Settlement Act Land Acquisition Funds Have Been Exhausted)**

110. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

111. An actual, substantial, and continuing controversy exists between the State and Defendants regarding whether funds appropriated pursuant to the Settlement Act remain available for land acquisition, and thus whether the abbreviated restricted fee procedure of Section 8(c) of the Settlement Act remains available for any acquisition by the Nation.

112. The controversy is not limited to the Site. The Nation has repeatedly invoked the Settlement Act's abbreviated procedure, including for the Town of Collins parcel in 2011 and 2016 and for a parcel in Grand Island in 2025, and the State has repeatedly objected that the funds were exhausted. DOI has never provided an accounting and has, upon information and belief, permitted land to be placed in restricted fee status notwithstanding the State's objections. Absent declaratory relief, the State will continue to face the removal of additional State territory from its sovereign

jurisdiction through a thirty-day procedure that affords no meaningful opportunity to resolve this recurring question.

113. Upon information and belief, the funds appropriated pursuant to the Settlement Act for land acquisition have been fully expended, as measured by the fair market value of the lands acquired, and no Settlement Act funds remain available for land acquisition.

114. The State is entitled to a declaration that the funds appropriated pursuant to the Settlement Act for land acquisition have been exhausted; that no further lands may be acquired by the Nation "with funds appropriated pursuant to" the Settlement Act; and that, accordingly, no lands acquired by the Nation in the future may be placed in restricted fee status through the abbreviated procedure of Section 8(c) of the Settlement Act.

## PRAYER FOR RELIEF

WHEREFORE, the State of New York respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A. On the First Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because the Site was not acquired with funds appropriated pursuant to the Settlement Act, as Section 8(c) requires;

B. On the Second Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because it confers restricted fee status on an acquisition that violates Sections 11(b)(4) and 11(c) of the federally approved Compact, and because DOI failed to consider those provisions;

C. On the Third Claim for Relief, declaring that the funds appropriated pursuant to the Settlement Act for land acquisition have been exhausted, that no further lands may be acquired by the Nation with funds appropriated pursuant to the Settlement Act, and that no lands acquired by the Nation in the future may be placed in restricted fee status through the procedure set forth in Section 8(c) of the Settlement Act;

D. On each Claim for Relief, holding unlawful, vacating, and setting aside the Decision under 5 U.S.C. § 706(2);

E. Declaring that the Site is not held in restricted fee status under Section 8(c) of the Settlement Act and remains subject to the jurisdiction of the State of New York;

F. Directing Defendants to take all actions necessary to give effect to the vacatur of the Decision, including rescinding or correcting any recordation or annotation of the Site as restricted fee land in the records of the Bureau of Indian Affairs;

G. In the alternative to the relief requested above, vacating and/or remanding to DOI with instructions to determine, on a complete record that includes an accounting of the Settlement Act funds and consideration of the Compact, whether the Site satisfies the conditions of Section 8(c) of the Settlement Act;

H. Awarding the State its costs as permitted by law; and

I. Granting such other and further relief as the Court deems just and proper.

Dated: Buffalo, New York
November 6, 2026

**NIXON PEABODY LLP**

By: /s/ Erik A. Goergen

Erik A. Goergen
40 Fountain Plaza
Suite 500
Buffalo, NY 14202
Tel: 716-853-8118
Email: egoergen@nixonpeabody.com

Christopher J. Porzio
275 Broadhollow Road
Suite 300
Melville, NY 11747
Tel: 516-832-7500
Email: cporzio@nixonpeabody.com
(*Admission forthcoming*)

*Attorneys for Plaintiff State of New York*